UNITED STATES *v.* RANDS ET UX.

No. 54. Argued October 18, 1967.—Decided November 13, 1967.

*Robert S. Rifkind* argued the cause for the United States. With him on the brief were *Solicitor General Marshall, Assistant Attorney General Weisl, Roger P. Marquis* and *A. Donald Mileur.*

*Alex L. Parks* argued the cause for respondents. With him on the brief were *Sidney Teiser* and *Robert B. Abrams.*

MR. JUSTICE WHITE delivered the opinion of the Court.

In this case the Court is asked to decide whether the compensation which the United States is constitutionally required to pay when it condemns riparian land includes the land's value as a port site. Respondents owned land

along the Columbia River in the State of Oregon. They leased the land to the State with an option to purchase, it apparently being contemplated that the State would use the land as an industrial park, part of which would function as a port. The option was never exercised, for the land was taken by the United States in connection with the John Day Lock and Dam Project, authorized by Congress as part of a comprehensive plan for the development of the Columbia River. Pursuant to statute [1] the United States then conveyed the land to the State of Oregon at a price considerably less than the option price at which respondents had hoped to sell. In the condemnation action, the trial judge determined that the compensable value of the land taken was limited to its value for sand, gravel, and agricultural purposes and that its special value as a port site could not be considered. The ultimate award was about one-fifth the claimed value of the land if used as a port. The Court of Appeals for the Ninth Circuit reversed, apparently holding that the Government had taken from respondents a compensable right of access to navigable waters and concluding that "port site value should be compensable under the Fifth Amendment." 367 F. 2d 186, 191 (1966). We granted certiorari, 386 U. S. 989, because of a seeming conflict between the decision below and *United States* v. *Twin City Power Co.*, 350 U. S. 222 (1956). We reverse the judgment of the Court of Appeals because the principles underlying *Twin City* govern this case and the Court of Appeals erred in failing to follow them.

The Commerce Clause confers a unique position upon the Government in connection with navigable waters. "The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all

---

[1] 74 Stat. 486, 33 U. S. C. § 578.

the navigable waters of the United States . . . . For this purpose they are the public property of the nation, and subject to all the requisite legislation by Congress." *Gilman* v. *Philadelphia,* 3 Wall. 713, 724–725 (1866). This power to regulate navigation confers upon the United States a "dominant servitude," *FPC* v. *Niagara Mohawk Power Corp.,* 347 U. S. 239, 249 (1954), which extends to the entire stream and the stream bed below ordinary high-water mark. The proper exercise of this power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject. *United States* v. *Chicago, M., St. P. & P. R. Co.,* 312 U. S. 592, 596–597 (1941); *Gibson* v. *United States,* 166 U. S. 269, 275–276 (1897). Thus, without being constitutionally obligated to pay compensation, the United States may change the course of a navigable stream, *South Carolina* v. *Georgia,* 93 U. S. 4 (1876), or otherwise impair or destroy a riparian owner's access to navigable waters, *Gibson* v. *United States,* 166 U. S. 269 (1897); *Scranton* v. *Wheeler,* 179 U. S. 141 (1900); *United States* v. *Commodore Park, Inc.,* 324 U. S. 386 (1945), even though the market value of the riparian owner's land is substantially diminished.

The navigational servitude of the United States does not extend beyond the high-water mark. Consequently, when fast lands are taken by the Government, just compensation must be paid. But "just as the navigational privilege permits the Government to reduce the value of riparian lands by denying the riparian owner access to the stream without compensation for his loss, . . . it also permits the Government to disregard the value arising from this same fact of riparian location in compensating

the owner when fast lands are appropriated." *United States* v. *Virginia Elec. & Power Co.,* 365 U. S. 624, 629 (1961). Specifically, the Court has held that the Government is not required to give compensation for "water power" when it takes the riparian lands of a private power company using the stream to generate power. *United States* v. *Chandler-Dunbar Water Power Co.,* 229 U. S. 53, 73–74 (1913). Nor must it compensate the company for the value of its uplands as a power plant site. *Id.,* at 76. Such value does not "inhere in these parcels as upland," but depends on use of the water to which the company has no right as against the United States: "The Government had dominion over the water power of the rapids and falls and cannot be required to pay any hypothetical additional value to a riparian owner who had no right to appropriate the current to his own commercial use." *Ibid.*

All this was made unmistakably clear in *United States* v. *Twin City Power Co.,* 350 U. S. 222 (1956). The United States condemned a promising site for a hydroelectric power plant and was held to be under no obligation to pay for any special value which the fast lands had for power generating purposes. The value of the land attributable to its location on the stream was "due to the flow of the stream; and if the United States were required to pay the judgments below, it would be compensating the landowner for the increment of value added to the fast lands if the flow of the stream were taken into account." 350 U. S., at 226.

We are asked to distinguish between the value of land as a power site and its value as a port site. In the power cases, the stream is used as a source of power to generate electricity. In this case, for the property to have value as a port, vessels must be able to arrive and depart by water, meanwhile using the waterside facilities of the port. In both cases, special value arises from access to,

and use of, navigable waters. With regard to the constitutional duty to compensate a riparian owner, no distinction can be drawn. It is irrelevant that the licensing authority presently being exercised over hydroelectric projects may be different from, or even more stringent than, the licensing of port sites. We are dealing with the constitutional power of Congress completely to regulate navigable streams to the total exclusion of private power companies or port owners. As was true in *Twin City,* if the owner of the fast lands can demand port site value as part of his compensation, "he gets the value of a right that the Government in the exercise of its dominant servitude can grant or withhold as it chooses. . . . To require the United States to pay for this . . . value would be to create private claims in the public domain." 350 U. S., at 228.

Respondents and the Court of Appeals alike have found *Twin City* inconsistent with the holding in *United States v. River Rouge Improvement Co.,* 269 U. S. 411 (1926). In that case, the Government took waterfront property to widen and improve the navigable channel of the Rouge River. By reason of the improvements, other portions of the riparian owner's property became more valuable because they were afforded direct access to the stream for the building of docks and other purposes related to navigation. Pursuant to § 6 of the Rivers and Harbors Act of 1918,[2] the compensation award for the part of the property taken by the Government was reduced by the value of the special and direct benefits to the remainder of the land. The argument here seems to be that if the enhancement in value flowing from a riparian location is real enough to reduce the award for another part of the same owner's property, consistency demands that these same values be recognized in the award when any riparian property is taken by the Gov-

---

[2] 40 Stat. 911, 33 U. S. C. § 595.

ernment. There is no inconsistency. *Twin City* and its predecessors do not deny that access to navigable waters may enhance the market value of riparian property. See *United States* v. *Commodore Park, Inc.,* 324 U. S., at 388, 390. And, in *River Rouge,* it was recognized that state law may give the riparian owner valuable rights of access to navigable waters good against other riparian owners or against the State itself. 269 U. S., at 418–419. But under *Twin City* and like cases, these rights and values are not assertable against the superior rights of the United States, are not property within the meaning of the Fifth Amendment, and need not be paid for when appropriated by the United States. Thus, when only part of the property is taken and the market value of the remainder is enhanced by reason of the improvement to navigable waters, reducing the award by the amount of the increase in value simply applies in another context the principle that special values arising from access to a navigable stream are allocable to the public, and not to private interest. Otherwise the private owner would receive a windfall to which he is not entitled.

Our attention is also directed to *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312 (1893), where it was held that the Government had to pay the going-concern value of a toll lock and dam built at the implied invitation of the Government, and to the portion of the opinion in *Chandler-Dunbar* approving an award requiring the Government to pay for the value of fast lands as a site for a canal and lock to bypass the falls and rapids of the river. *Monongahela* is not in point, however, for the Court has since read it as resting "primarily upon the doctrine of estoppel . . . ." *Omnia Commercial Co., Inc.* v. *United States,* 261 U. S. 502, 513–514 (1923). The portion of *Chandler-Dunbar* relied on by respondents was duly noted and dealt with in *Twin City* itself, 350 U. S. 222, 226, n. (1956). That aspect of the decision

has been confined to its special facts, and, in any event, if it is at all inconsistent with *Twin City,* it is only the latter which survives.

Finally, respondents urge that the Government's position subverts the policy of the Submerged Lands Act,[3] which confirmed and vested in the States title to the lands beneath navigable waters within their boundaries and to natural resources within such lands and waters, together with the right and power to manage, develop, and use such lands and natural resources. However, reliance on that Act is misplaced, for it expressly recognized that the United States retained "all its navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs, all of which shall be paramount to, but shall not be deemed to include, proprietary rights of ownership . . . ."[4] Nothing in the Act was to be construed "as the release or relinquishment of any rights of the United States arising under the constitutional authority of Congress to regulate or improve navigation, or to provide for flood control, or the production of power."[5] The Act left congressional power over commerce and the dominant navigational servitude of the United States precisely where it found them.

For the foregoing reasons, the judgment of the Court of Appeals is reversed and the case remanded with direction to reinstate the judgment, of the District Court.

*Reversed and remanded.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

---

[3] 67 Stat. 29, 43 U. S. C. §§ 1301–1343.

[4] 67 Stat. 32, 43 U. S. C. § 1314.

[5] 67 Stat. 31, 43 U. S. C. § 1311 (d).