TAMULION v STATE WATERWAYS COMMISSION

1. CONSTITUTIONAL LAW—STATUTES—CLAIMS AGAINST THE STATE—NO-
   TICE.

   The six-month notice of intention to file a claim required by the
   Court of Claims Act is unconstitutional (MCLA 600.6431[3]).

2. EMINENT DOMAIN—CONSTITUTIONAL LAW—PRIVATE PROPERTY—
   TAKING—JUST COMPENSATION—LIABILITY—SOVEREIGN IMMU-
   NITY.

   A victim of a taking of private property for a public use is
   entitled under the Michigan and United States Constitutions to
   just compensation for the value of the property taken; sover-
   eign immunity does not insulate the state from liability be-
   cause the compensatory obligation arises under the constitution
   and not in tort (US Const, Am V; Const 1963, art 10, § 2).

3. EMINENT DOMAIN—CONSTITUTIONAL LAW—PRIVATE PROPERTY—
   TAKING—JUST COMPENSATION—PHYSICAL INVASION.

   It is not necessary that there be a direct physical invasion of land
   to constitute a taking subject to the constitutional protection of
   just compensation; the entire circumstances of the case consti-
   tute a taking of private property subject to the constitutional
   protection of just compensation where land adjacent to the site
   of a harbor newly constructed by the government was eroded
   by the construction to the extent that the remedial work
   required to prevent further damage to the property effectively
   rendered the property unusable and where the property was
   not simply in the vicinity of the harbor, but became a part of
   it, as made clear by the design of the harbor in that the
   peninsula on which the property lay was used as a wall
   designed to bear the brunt of storms and protect the harbor

REFERENCES FOR POINTS IN HEADNOTES

[1] 58 Am Jur 2d, Notice §§ 6, 7.

[2] 26 Am Jur 2d, Eminent Domain § 171.

[3] 26 Am Jur 2d, Eminent Domain § 154.

[4, 5] 26 Am Jur 2d, Eminent Domain §§ 189–198.

   27 Am Jur 2d, Eminent Domain § 318.

from them, thus impressing the land into serving a public use in the functioning of the project.

4. EMINENT DOMAIN—CONSTITUTIONAL LAW—PRIVATE PROPERTY—
    TAKING—JUST COMPENSATION—NAVIGATIONAL SERVITUDE—ERO-
    SION—DEPRIVATION OF ACCESS.

    A navigational servitude in favor of the Federal Government as to riparian and littoral lands does not excuse recompense to owners of fast land actually taken for an improvement in navigation and the rule that riparian or littoral owners are not entitled to compensation for erosion damage or for loss of access to navigational waters does not apply to an actual taking of fast land which is in part accomplished or accompanied by erosion and deprivation of access; such a taking is no less demanding of compensation because of these methods or incidents of taking.

5. EMINENT DOMAIN—CONSTITUTIONAL LAW—PRIVATE PROPERTY—
    TAKING—LIABILITY.

    The State Waterways Commission was sufficiently involved in the construction of a harbor which appropriated private land for a public use to support the imposition of liability for the taking where, although the harbor was actually built by private contractors under the control and direction of the United States Army Corps of Engineers, it contributed $38,000 toward the cost of construction, it consulted and offered suggestions as to the design of the harbor, it agreed to acquire all the interests in land necessary for the construction of the project and to indemnify the Army Corps of Engineers for any claims against the Corps arising out of the construction of the project, it played a leading role in the remedial activities which were undertaken in an effort to stop the erosion of the taken land, it communicated with the owners of the land and solicited their permission for the remedial operations, and it, as a representative of the people of the state, stands as the primary beneficiary of the appropriation of the land.

Appeal from the Court of Claims, William F. Ager, Jr., J. Submitted Division 2 February 9, 1972, at Lansing. (Docket No. 10372.) Decided September 27, 1973.

Complaint by Bron G. Tamulion and Marie Tamulion against the State Waterways Commission for

damages resulting from building a harbor on land adjacent to their property. Complaint dismissed. Plaintiffs appeal. Reversed and remanded for further proceedings.

*Allaben, Massie, Vander Weyden & Timmer* (by *John T. Timmer* and *Timothy I. Miner),* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Douglas Salisbury,* Assistant Attorney General, for defendant.

Before: McGREGOR, P. J., and LEVIN and J. H. GILLIS, JJ.

PER CURIAM. Plaintiffs, Bron G. and Marie Tamulion, appeal the dismissal of their action by the Court of Claims. We reverse and remand for a determination of damages.

The Tamulions, residents of a Chicago suburb, own a lot and cottage on Lake Superior near Big Bay, Michigan. In 1961 a small-craft harbor of refuge was constructed adjoining the Tamulion property. As a result, their property is now 80 feet east of the tip of a newly formed peninsula bordered by Lake Superior on the north, the entrance to the harbor on the west and the harbor basin on the south. Breakwaters were constructed at the harbor entrance, extending into Lake Superior.

Shortly after the harbor was completed, serious erosion problems were encountered along the Lake Superior shoreline adjacent to the harbor entrance. It seems clear that if the erosion had continued much of the value of the harbor might have been destroyed.

In January, 1963, the Michigan State Water-

ways Commission wrote to the Tamulions requesting permission to enter the Tamulion property to take remedial measures to stop the erosion. After some further communication, the Tamulions gave their written permission for such work.[1]

When the Tamulions arrived at their cottage the following summer they discovered that the remedial work had been completed. It consisted of tons of jagged rocks and boulders dumped on the entire length of the beach. This rock made access to the water virtually impossible, certainly unsafe. The utility of the property as a lakeside residence was thereby largely destroyed. The erosion was not halted, and it appears from a photograph introduced at trial that by 1969 the Tamulions' cottage was precariously close to being swept into Lake Superior.

The harbor had been built by private contractors under the control and direction of the United States Army Corps of Engineers. The harbor was one of a series of such harbors being built throughout the Great Lakes. Local cooperation was deemed essential to these projects, and the Waterways Commission had, by a resolution of December 5, 1947, agreed to furnish this cooperation.

The Tamulions' injury was accomplished by two levels of government—state and federal—acting, at least to some degree, in concert. When questioned by the Tamulions, each disclaimed liability for the damage, and each offered the opinion that the

---

[1] The permit granted to the United States "the right to enter upon, use and occupy the shoreward portion of the above described 100-foot lot during the period from 1 February 1963 to 31 December 1963 for the purpose of placing earth and rock fill thereon in connection with proposed shore protection work at the landward end of the East Breakwater of Big Bay Harbor, Lake Superior, together with the right of ingress and egress thereto.

"This permit is granted with the understanding that the Government will clean up the permit area in a neat and workmanlike manner upon completion of the protection work."

Tamulions might obtain relief from the other.[2] The Tamulions eventually chose to bring this action against the Waterways Commission in State court.

## I

We first dispose of two preliminary issues raised by the Waterways Commission. The first concerns the failure of the Tamulions to give notice of their intention to file a claim against the state within six months of the injury, as provided for in the Court of Claims Act, MCLA 600.6431(3); MSA 27A.6431(3). This notice requirement has been held unconstitutional (see *Reich v State Highway Commission,* 43 Mich App 284; 204 NW2d 226 [1972], *leave den* 389 Mich 772 [1973]), on the authority of *Reich v State Highway Department,* 386 Mich 617; 194 NW2d 700 (1972).

The second is that the written permission given by the Tamulions precludes recovery. This permission was solicited by the Waterways Commission in a letter which does not give any hint of the true nature of the work that was to be done. The letter read, in part:

> "[C]ertain remedial work in the area is required to prevent further damage to both the public property and to private property adjacent to the breakwaters. The Corps proposes to restore the banks to their former condition and assure that this condition is maintained through the placing of rock protection in front of the restored banks.
>
> *         *         *
>
> "It is presently intended to undertake this work at the latest in early spring so that the project will not interfere with normal seasonal uses of the property."

---

[2] Noteworthy in this connection are the last two paragraphs of the letter from the Waterways Commission to Bron Tamulion dated October 1, 1963 set forth in fn 3.

In a follow-up letter, mailed when it developed that the "temporary permit forms" had not been sent with the first letter, the Waterways Commission stated "that some slight erosion has occurred on your property and it is the desire of the Corps of Engineers to complete the required rehabilitation in this area before the erosion becomes worse".

The Tamulions were not asked to give permission for the Corps of Engineers to destroy the use and value of their property, but, rather, were specifically led to believe that the "rehabilitation" would not "interfere with normal seasonal uses of the property".

When the Tamulions complained that the work had been done in a manner not authorized by the permission sought and given and had rendered their property unusable, the Waterways Commission did not claim that the radical measures had been contemplated when the permission was sought—rather that subsequent accelerated erosion necessitated the taking of these measures.[3]

---

[3] The Commission replied to Tamulion's complaints by letter dated October 1, 1963, as follows:

"This is in answer to your letter of September 24, 1963, inquiring as to the position of this agency insofar as the emergency repairs conducted by the Corps of Engineers involving your property at Big Bay is concerned.

"When we first negotiated with you for a permit to allow the Corps of Engineers to enter upon your property and place shoreline erosion protective devices, the erosion on your property was reported to us as being slight. However, after signing of the permit and shortly before commencement of the work, we were advised that erosion on your property had accelerated considerably and that if the protective work was not accomplished shortly thereafter, there was a strong possibility that your cottage would be washed into the lake.

"This situation also governed the type of protection provided by the Corps of Engineers and, as a result, the rubblemound added to the shoreline had to be increased to remedy the modified conditions. As I see it, the placing of this protection was all that saved your property from virtually a total loss.

"Our legal position in this entire transaction is perhaps a little

We can only conclude that the Tamulions did not intend to and did not in fact give permission for the operations which were performed.

## II

The essence of the Tamulions' claim is that the Corps of Engineers and the Waterways Commission, acting in concert, have appropriated their property for public use without paying just compensation. A *taking* of private property for a public use without the commencement of condemnation proceedings is known as an inverse condemnation. A victim of such a taking is entitled under the Michigan[4] and United States[5] Constitutions to just compensation for the value of the property taken.[6] Since the compensatory obligation arises under the constitution and not in tort, the doctrine

difficult for a layman to understand. We are bound by legal assurances to hold the Corps of Engineers harmless from any claims for damages resulting from this specific project. However, our liability is dependent upon the Corps of Engineers first being held liable and, in matters pertaining to navigation, establishing liability against the Corps is generally most difficult. Further, our funds are provided by direct appropriation of the Legislature and we have no funds provided for purposes such as this nor any likelihood of securing such an appropriation without a legal basis therefor.

"We have reviewed this matter most thoroughly to determine whether or not we might be able to determine a use for the property in question in our regular program but the location does not lend itself to such usage. It therefore appears that there is nothing that we can do to be of assistance to you in this matter."

4 Const 1963, art 10, § 2.

5 US Const, Am V.

6 *Cf. Olsen v Dearborn,* 290 Mich 651; 288 NW2d 295 (1939); *Buckeye Union Fire Insurance Co v Michigan,* 383 Mich 630, 641; 178 NW2d 476, 482 (1970).

*See, also, Bauerle v Charlevoix County Board of Road Commissioners,* 388 Mich 520; 201 NW2d 799 (1972), where the Court entered a mandatory injunction requiring restoration of the property and a negative injunction prohibiting further interference and assessed damages for the period of interference.

*See, generally,* 30 CJS, Eminent Domain, § 399, p 475; 27 Am Jur 2d, Eminent Domain, § 478, p 408.

of sovereign immunity does not insulate the state from liability.

The entire circumstances of this case constitute such a taking and entitle the Tamulions to compensation. The extremely rapid erosion of the Tamulion property and the remedial efforts of the governmental agencies involved were manifestations of the same underlying fact—the Tamulion property was not simply in the vicinity of the harbor, but rather it became a part of the harbor. Reference to the design of the harbor makes this clear. The peninsula (created when the harbor was dredged) on which the Tamulion property lay was used as a wall designed to bear the brunt of lake storms while protecting small craft huddled in the basin of the harbor which was located mainly to the south of their property. Indeed, for that reason, the property of the Tamulions and their neighbors was the most important part of the harbor of refuge.

We have a case then in which property neighboring a government project does not merely suffer some damage as a consequence of the government's construction of the project, but is actually impressed into serving a public use in the functioning of the project. In such a case it is not necessary that there be a direct physical invasion of the land to invoke the constitutional protections.[7] Just as the property to the south and west (on which the basin and entrance of the harbor were dredged) was taken, so too the Tamulions' property was taken.

We have considered whether the well-recognized navigational servitude as to riparian and littoral lands in favor of the federal government may

[7] See *United States v Causby*, 328 US 256; 66 S Ct 1062; 90 L Ed 1206 (1946).

excuse compensation in this case. The servitude arises from the principle that navigable waterways are a part of the public domain, in which riparian or littoral property owners can obtain no rights as against the government.[8]

Applications of this principle frequently present difficult problems in balancing the rights of riparian or littoral owners against the rights of the government. We recognize that there has been a reluctance to award compensation in cases involving injury caused by activities in aid of navigation.[9] This reluctance seems grounded on the enormous commercial importance of navigation coupled with the almost limitless consequences that may flow from navigational improvements. Courts have hesitated to award compensation lest the costs of navigational improvements become prohibitive and seriously impede commerce.[10]

Fortunately we need not consider the vagaries of

[8] For an extended discussion *see* 4 Waters and Water Rights (Clark Ed), § 305, p 97, *et seq.*

[9] "[T]here have been few recoveries against the Government between *Pumpelly v Green Bay & Mississippi Canal Co* [80 US (13 Wall) 166; 20 L Ed 557 (1871)], the 1871 decision awarding compensation for flooding riparian uplands, and *United States v Kansas City Life Insurance Co* [339 US 799, 70 S Ct 885; 94 L Ed 1277 (1950)], which permitted recovery in 1950 when the waters of a non-navigable tributary were backed under riparian property." 4 Waters and Water Rights (Clark Ed), § 305.6, pp 132–133.

*See, also, United States v Rands,* 389 US 121; 88 S Ct 265; 19 L Ed 2d 329 (1967); *Pitman v United States,* 457 F2d 975 (Ct Cls, 1972); *Sherrill v United States,* 381 F2d 744 (Ct Cls, 1967).

[10] *See, e.g., Miramar Co v Santa Barbara,* 23 Cal 2d 170; 143 P2d 1 (1943), where the littoral owner sought compensation for erosion damage to property several miles from the navigational improvement claimed to have caused the erosion.

*Compare United States v Causby,* 328 US 256, 260; 66 S Ct 1062, 1065; 90 L Ed 1206, 1210 (1946), where the Court refused to enforce the "ancient doctrine that at common law ownership of the land extended to the periphery of the universe" in light of the public interest in using the skys for airplane flight, and the potential impediment to this interest if aircraft were treated as trespassers on the land over which they flew.

the navigational servitude, for it has never been held to excuse recompense to owners of fast land actually taken for an improvement in navigation.[11] It would not have excused payment of compensation to the owners of the land dredged for the entrance and the basin of the harbor. It does not excuse payment to the Tamulions for the use of their land as a wall of the harbor and the resulting loss of the beneficial use of their property.

In so ruling we need not dispute the generally recognized rule that riparian or littoral owners are not entitled to compensation for erosion damage[12] or for loss of access to navigable waters[13] occurring as a consequence of navigational improvements. We hold only that an actual taking of fast land which is in part accomplished or accompanied by erosion and deprivation of access is no less demanding of compensation because of these methods or incidents of taking.

## III

The trial judge in denying recovery found the involvement of the Waterways Commission in the construction of the harbor insufficient to support

[11] *See* 4 Waters and Water Rights (Clark Ed), § 305.4(B), pp 122–123; *cf. United States v Chicago, M S P & P R Co*, 312 US 592; 61 S Ct 772; 85 L Ed 1064 (1941). *See, also,* fn 9.

[12] *See Franklin v United States*, 101 F2d 459 (CA 6, 1939), *aff'd on other grounds* 308 US 516; 60 S Ct 170; 84 L Ed 439 (1939); *W H Ross Construction Co v Yearsley*, 103 F2d 589 (CA 8, 1939); *Pitman v United States, supra; Latourette v United States*, 150 F Supp 123 (D Or, 1957); *Miramar Co v Santa Barbara, supra;* 4 Waters and Water Rights (Clark Ed), § 306.3(D), p 170.

[13] *See Gibson v United States*, 166 US 269; 17 S Ct 578; 41 L Ed 996 (1897); *United States v Commodore Park, Inc*, 324 US 386; 65 S Ct 803; 89 L Ed 1017 (1945); *United States v Rands*, 389 US 121; 88 S Ct 265; 19 L Ed 2d 329 (1967); 4 Waters and Water Rights (Clark Ed), § 305.3(A), p 116.

the imposition of liability.[14] We disagree. The Waterways Commissioner was involved in the appropriation of the Tamulions' property in several important respects.

First, the Waterways Commission was involved in construction of the harbor. It contributed $38,-000 towards the cost of construction; it was consulted and offered suggestions as to the design of the harbor; and by the resolution of December 5, 1947, it agreed to acquire "all" the interests in land "necessary for the construction of the project" and to indemnify the Corps of Engineers for any claims against the corps arising out of the construction of the project.[15]

Second, it played a leading role in the "remedial" activities which were undertaken in an effort to stop the erosion. It was the Waterways Commission which communicated with the Tamulions and which solicited their permission for these operations.

Finally, the Waterways Commission, as representative of the people of this state, stands as the primary beneficiary of the appropriation of the Tamulions' property.

Reversed and remanded to the trial court for the determination of damages.

[14] "However, on reviewing and re-examining all of the testimony and exhibits presented in the case, the Court reluctantly reaches the decision that plaintiffs have failed to sustain their burden of proving that defendant can in any way be held liable for the damage done to plaintiffs' property by construction of the harbor of refuge or placing the boulders on plaintiffs' property. The Court finds that the defendant was not responsible for the work done."

[15] The resolution includes the following "assurances" by the Waterways Commission:

"(d) Hold and save the United States free from damages due to the construction and maintenance of the works; and

"(e) Provide without cost to the United States, all lands, easements and rights-of-way necessary for the construction of the projects, including suitable spoil disposal areas when and as required."