State of NORTH DAKOTA,
et al., Plaintiffs,

and

State of South Dakota, and State
of Nebraska, et al., Plain-
tiffs/Intervenors,

v.

The UNITED STATES ARMY CORPS
OF ENGINEERS, et. al.,
Defendants.

No. A1–03–050.

United States District Court,
D. North Dakota,
Southwestern Division.

May 29, 2003.

Lyle Gregory Witham, Dean J. Haas, Bismarck, ND, for Plaintiffs/Intervenors.

Daniel W. Pinkston, U.S. Dept. of Justice, Denver, CO, Cameron W. Hayden, U.S. Attorney's Office, Bismarck, ND, Fred R. Disheroon, U.S. Dept. of Justice, Washington, DC, for U.S. Army Corps of Engineers.

Cameron W. Hayden, U.S. Attorney's Office, Bismarck, ND, Fred R. Disheroon, U.S. Dept. of Justice, Washington, DC, for David A Fastabend, Kurt F. Ubbelohde.

Daniel H. Israel, Boulder, CO, for Three Affiliated Tribes of Fort Berthold Reservation.

Clark Jay Bormann, Bormann Law Office, Bismarck, ND,David D. Cookson, Lincoln, NE, for State of Nebraska.

John P. Guhin, Attorney General's Office, Pierre, SD, for State of South Dakota.

## ORDER DISSOLVING EX PARTE TEMPORARY RESTRAINING ORDER

HOVLAND, Chief Judge.

### I. PROCEDURAL HISTORY

The matter before the Court is the Defendants' (the "Corps of Engineers") Motion to Dissolve the Ex Parte Temporary Restraining Order entered by state district court Judge Gail Hagerty, on April 29,

2003, and extended by this Court on May 7, 2003. On May 16, 2003, the Court modified the Ex Parte Temporary Restraining Order with the consent of the parties. The Ex Parte Temporary Restraining Order ("TRO") enjoined the Corps of Engineers from exceeding specified discharge rates at Garrison Dam and lowering elevation levels of Lake Sakakawea and Lake Oahe.

The State of North Dakota filed a complaint in state district court on April 29, 2003. In its complaint, the State alleges that the Corps of Engineers violated North Dakota's water quality standards in Lake Sakakawea through its operation of the Garrison Dam. *See* N.D.C.C. § 61–28–06(1)(b); N.D. Admin. Code § 33–16–02.1. It is alleged in the complaint, and the state district court found in its TRO, that Section 313(a) of the federal Clean Water Act constitutes a waiver of sovereign immunity which allows states to sue federal entities for alleged violations of state water quality standards. *See* 33 U.S.C. § 1323(a). In essence, the State of North Dakota alleges that the Corps of Engineers' management of water levels in Lake Sakakawea during the next five (5) months will violate North Dakota's water quality standards as it relates to the maintenance of a cold water fishery in Lake Sakakawea.

The April 29, 2003, Ex Parte Temporary Restraining Order (a) enjoined the Corps of Engineers from releasing water from Garrison Dam during May 2003 in excess of a daily average of 17,450 cfs and establishes specific release amounts for June August 2003; (b) ordered the Corps to submit a plan to the North Dakota state court within twenty days to achieve and maintain compliance with all North Dakota water pollution laws and water quality standards; (c) required the Corps to submit to the state court an implementation schedule for the Corps to come into compliance with North Dakota water pollution laws and water quality standards as soon as practicable; (d) prohibited the Corps from lowering the water elevation at Lake Oahe prior to a show cause hearing; and (e) ordered the Corps to show cause why the state court should not issue a preliminary injunction which specifies the amount of water which may be released by the Corps from Garrison Dam for the months of May through September 2003.

On April 30, 2003, the day following the issuance of the TRO, the Defendants removed the case to federal court. On May 6, 2003, the Corps of Engineers filed a Motion to Dissolve the Ex Parte Temporary Restraining Order. On May 6, 2003, the State of Nebraska filed a Motion to Intervene pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure. South Dakota filed an identical motion on May 8, 2003. The Court granted the Motions to Intervene on May 9, 2003.

South Dakota also seeks injunctive relief to (1) prevent the Corps of Engineers from lowering water levels in other main stem reservoirs to increase the elevation in Lake Sakakawea; (2) to prevent irreparable harm under the 1944 Flood Control Act and the Administrative Procedure Act to fisheries of main stem reservoirs when the harm is inflicted to benefit downstream navigation; and (3) to prevent lowering the elevation of Lake Oahe to the extent that it will impair the designated cold water fishery in that lake. On May 23, 2003, South Dakota filed a Motion for a Preliminary Injunction.

Nebraska has also filed a complaint against the same Defendants for alleged violations of the 1944 Flood Control Act. Nebraska asserts that the Flood Control Act

"... established the hierarchy of authorized uses of the Main Stem Missouri River reservoirs. Flood control and navigation are the dominant functions of the Corps' reservoirs. Secondary uses

are authorized by the FCA, provided they do not interfere with these dominant functions and lawful uses existing at the time the FCA was enacted. *See* Nebraska Complaint, ¶ 2".

In its prayer for relief, Nebraska seeks an order requiring the Corps of Engineers to operate Garrison Dam and all other federal reservoirs within this Court's jurisdiction in accordance with the Flood Control Act, the Master Manual and the Corps' Annual Operating Plan for 2003. *See* Nebraska Complaint, ¶ 9. Nebraska has also filed notice that it is requesting the Eighth Circuit stay this proceeding until a decision is issued in a pending Eighth Circuit case. Nebraska also requested an Order of Transfer from the Multidistrict Litigation Panel.

In summary, North Dakota seeks injunctive relief that would limit releases from Garrison Dam throughout the summer of 2003. South Dakota wants the Court to order that water elevations in other main stem reservoirs not be lowered in order to raise the elevation of Lake Sakakawea and specifically wants to prevent the lowering of water elevations in Lake Oahe. The State of Nebraska wants the Corps of Engineers to comply with the 2003 Annual Operating Plan forecast which means drawing down the water levels from the upper reservoirs throughout the summer to support the Endangered Species Act, navigation, and other downstream needs. The diverse interests of the states and their needs for adequate water levels in the Missouri River and its reservoirs come at a time when this region of the country is again experiencing drought conditions.

## II. BACKGROUND

### A. THE MISSOURI RIVER MAIN STEM DAM SYSTEM.

The Commerce Clause confers upon Congress complete authority with re-gard to the regulation of navigable waters. *U.S. v. Rands,* 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967). Congress has the constitutional authority to regulate the nation's waters and it may delegate that power to a federal executive agency as it has done with the Corps of Engineers under the Flood Control Act of 1944.

Pursuant to Section 9 of the Flood Control Act of 1944, Congress authorized the construction of all but one of the Missouri River main stem dams in accordance with the "Pick Plan," a Corps of Engineers' planning document which proposed navigational improvements and flood control, and the "Sloan Plan," a Bureau of Reclamation planning document which emphasized the use of water resources for irrigation in the upper basin states. The combined plans are commonly referred to as the "Pick–Sloan Plan." The plans set forth broad goals and objectives including flood control, hydro power, irrigation, navigation, wildlife, and recreation.

Congress authorized the Missouri River Main Stem Dam System by adopting the "Pick–Sloan Plan" in the Flood Control Act of 1944. Pursuant to this Congressional authorization, the following six (6) dams and reservoirs were constructed:

1) Fort Peck Dam (Montana) and Fort Peck Lake;

2) Garrison Dam (North Dakota) and Lake Sakakawea;

3) Oahe Dam (South Dakota) and Lake Oahe located in both South Dakota and North Dakota;

4) Big Bend Dam (South Dakota) and Lake Sharpe;

5) Fort Randall Dam (South Dakota) and Lake Francis Case;

6) Gavins Point Dam (border of South Dakota and Nebraska) and Lewis & Clark Lake.

The Missouri River is America's longest river. The Missouri River Main Stem Dam System is North America's largest reservoir system with the capacity to store 73.4 million acre-feet of water. Garrison Dam was constructed from 1947–1954. The dam is located on the Missouri River between Mercer and McLean Counties. Garrison Dam is the fifth largest dam in the United States and Lake Sakakawea, its reservoir, is the third largest man-made lake in the United States. Garrison Dam National Fish Hatchery, located at the base of the dam, is the largest walleye and northern pike producing facility in the world.

Lake Sakakawea extends approximately 178 miles and at normal operating pool (1850 feet mean sea level) the lake covers 368,000 acres and has approximately 1,300 miles of shoreline. It is the largest dam in the system with a storage capacity of approximately 23.8 million acre-feet of water, or approximately 32% of the total storage capacity of 73.4 million acre-feet of water in the Missouri River system. Lake Oahe, which extends into North Dakota from a dam located in South Dakota, has a storage capacity of approximately 23.1 million acre-feet of water, or approximately 31% of the total storage capacity of the Main Stem Dam System.

The Corps of Engineers has developed a water control plan for the operation of the Missouri River Main Stem Dam System that is designed to serve the congressionally authorized project purposes. The guidelines used in the execution of the water control plan are documented in the Missouri River Main Stem Reservoir System Master Reservoir Regulation Manual commonly referred to as the "Master Manual." The Master Manual was first published in 1960 and was last revised in 1979.

In developing annual projections concerning the operation of the main stem system, the Corps of Engineers attempts to work with federal and state agencies, local governments, and citizens to produce a plan each year known as the "Annual Operating Plan" (AOP). The Annual Operating Plan is designed to allow for public input and to inform interested river users about river operations for the upcoming year. Because it is impossible to predict with certainty how much water the Missouri River will receive in any given year, the Annual Operating Plan sets forth various scenarios as to how the Main Stem Dam System will be operated depending upon the timing and quality of runoff. The current Annual Operating Plan was issued in its final form in January 2003.

## B. *THE CLEAN WATER ACT*

The Federal Water and Pollution Control Act, commonly referred to as the Clean Water Act, 33 U.S.C. § 1251 *et. seq.* was designed to "restore and maintain the chemical, physical, and biological integrity of the nation's waters." 33 U.S.C. § 1251(a). The Clean Water Act provides for two primary sets of water quality measures: effluent limitations, found in 33 U.S.C. § 1311, and water quality standards, found in 33 U.S.C. § 1313.

The effluent limitations section focuses on the control of individual discharges from "point sources" into the navigable waters. A "point source" is defined as "any discernable, confined, and discrete conveyance" such as a pipe, ditch, or conduit from which "pollutants" may be discharged in navigable waters. *See* 33 U.S.C. § 1362(14). The Clean Water Act provides that the discharge of any "pollutant" by any person shall be unlawful. The term "pollutant" is defined as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock,

sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." *See* 33 U.S.C. § 1362(6). The term "pollution" as opposed to "pollutant" has a broader definition under federal law and means the "man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of the water." *See* 33 U.S.C. § 1362(19). The courts have determined that the release of water from dams does not equate with the addition of "pollutants" to navigable waters. *See Missouri ex rel. Ashcroft v. Dept. of the Army,* 672 F.2d 1297, 1303–1304 (8th Cir.1982); *National Wildlife Federation v. Gorsuch,* 693 F.2d 156 (D.C.Cir.1982).

North Dakota has not alleged that the Corps of Engineers is discharging pollutants into the Missouri River in violation of Sections 301 [33 U.S.C. § 1311] and 402 [33 U.S.C. § 1342] of the Clean Water Act. In fact, North Dakota has specifically stated its cause of action does *not* arise under the Clean Water Act's permitting system, which regulates the discharge of pollutants into navigable waters. *See* 33 U.S.C. §§ 1311, 1342. Although previous decisions regarding the Corps of Engineers activities as it relates to the discharge of pollutants may be somewhat analagous to North Dakota's claims, they are not controlling.

Under Section 303, the Clean Water Act directs each state to establish its own water quality standards, subject to the procedures set forth in federal statutes and regulations. *See* 33 U.S.C. § 1313. State water quality standards must contain three elements, (1) designated uses, (2) numeric or narrative water quality criteria, and (3) antidegradation rules. 40 C.F.R. § 131.6(a), 136.11(a)(1), 131.11(b)(1) and (b)(2), 131.6(d), 131.12. There is no mechanism in the Clean Water Act for the enforcement of water quality standards adopted by the states; rather the enforcement is left to the states.

## C. *NORTH DAKOTA WATER POLLUTION LAW AND WATER QUALITY STANDARDS*

On March 27, 2003, North Dakota Governor John Hoeven signed an emergency bill amending North Dakota's water quality statute which enabled this action to be brought by the State. Section 61–28–06(1) of the North Dakota Century Code states in relevant part as follows:

1. It shall be unlawful for any person:

a. To cause pollution of any waters of the state or to place or cause to be placed any wastes in a location where they are likely to cause pollution of any waters of the state; and

b. To discharge any wastes into any waters of the state which reduce the quality of such waters below the water quality standards established therefor by the department.

The statute also provides that:

3. Notwithstanding any other provisions of this chapter, and except as in compliance with the provisions of this chapter, and any rules and regulations promulgated hereunder, the discharge of any wastes by any person shall be unlawful. The department may seek injunctive relief for a threatened or continuing violation of a water quality standard, including any violations of the narrative standards, if the department determines that the violation will substantially interfere with or cause or threaten to cause long-term or irreparable harm to waters of this state that the department determines has state-wide or regional significance or has a substantial impact to a local community. The authority to seek injunctive relief for a violation of the

water quality standards, including violations of the narrative standards, is limited to the department, after obtaining written approval of the governor, and may not be enforced by any other person.

N.D.C.C. § 61–28–06(3). "Person" is defined in the statute to include "*any state or federal agency or entity responsible for managing a state or federal facility.*" N.D.C.C. § 61–28–02(5). "Pollution" is defined as "the manmade or man-induced alteration of the physical, chemical, biological, or radiological integrity of any waters of the state." N.D.C.C. § 61–28–02(7). This is virtually the same definition of "pollution" found in the federal Clean Water Act.

## D.  *HISTORY OF THIS LITIGATION*

On February 20, 2003, the North Dakota Department of Health issued a "Notice of Violation" to the Corps of Engineers alleging apparent continuing violations and actions that threaten to violate North Dakota's water quality standards applicable to Garrison Dam and Lake Sakakawea. The Notice of Violation indicated that the North Dakota Department of Health may file suit against the Corps of Engineers. In essence, the Notice of Violation asserted that the Corps' management of Lake Sakakawea constitutes a form of "pollution" under state law which would threaten the lake's cold water fishery by decreasing the lake's water elevation.[1]

Without prior notice to the Corps of Engineers, the State of North Dakota filed a complaint and a 60–page Motion for Ex Parte Temporary Restraining Order and Order to Show Cause for Preliminary Injunction on April 29, 2003. The state district court signed the TRO without a hearing. The complaint seeks a declaratory judgment that the Corps of Engineers' management of Lake Sakakawea and Garrison Dam violates North Dakota's water pollution laws and water quality standards. In essence, the State of North Dakota alleges that the Corps' management of water levels in Lake Sakakawea during the next five (5) months will violate North Dakota water quality standards relating to the maintenance of a cold water fishery in Lake Sakakawea. The Corps of Engineers now seeks to dissolve the Ex Parte Temporary Restraining Order.

There is no dispute that the Missouri River Basin is now in the fourth year of a serious drought. The State of North Dakota is contending that the Corps of Engineers' management of the Main Stem Dam System, and particularly the management of the release of waters from Garrison Dam, constitutes a form of "pollution" because it is a "man-made or man-induced" change that has altered the physical, chemical, and biological integrity of Lake Sakakawea. According to the State, adherence to the Corps of Engineers' April 1, 2003, projected forecast and its current Annual Operating Plan, will result in no cold water fish habitat remaining in Lake Sakakawea by the end of the summer of 2003 if the Corps follows its projected releases. It is undisputed that at the present time, no specific violations of North Dakota law or of any water quality regulations have occurred.

The State of North Dakota is seeking injunctive relief to (1) ensure that the average elevation of Lake Sakakawea remains above the threshold of 800,000 acre-

---

1.  As previously noted, the definition of "pollution" under North Dakota law and under the federal Clean Water Act is virtually the same. The North Dakota Department of Health may not adopt rules more stringent than corresponding federal regulations unless it makes written findings after public comment and hearing that the corresponding federal regulations are not adequate to protect the environment of the state. *See* N.D.C.C. § 23–01–04.1(2).

feet of cold water fish habitat during the 2003 summer months; and (2) to avoid the irreparable harm threshold by reducing forecast releases from Garrison Dam by an average of 2,350 cfs throughout the summer. The evidence presented in the affidavits of Deutschman, Sando, and Power seek to demonstrate that the survival of the cold water fishery in Lake Sakakawea this summer is dependent upon the average elevation of Lake Sakakawea in May before it stratifies; and the amount that inflow into the lake exceeds outflow during the months of June, July, and August.

## III. *LEGAL ANALYSIS*

It is well-established that after the removal of an action from state court, the federal court acquires exclusive subject matter jurisdiction over the litigation. *See Ward v. Resolution Trust Corp.*, 972 F.2d 196, 198 (8th Cir.1992). The litigation proceeds as if it had originally been brought in federal court rather than in state court. *Nissho–Iwai Amer. Corp. v. Kline*, 845 F.2d 1300, 1303 (5th Cir.1988). Pursuant to 28 U.S.C. § 1450, "[A]ll injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court." 28 U.S.C. § 1450 is designed to promote judicial economy by making it unnecessary to duplicate in federal court the pleadings previously filed in state court and to ensure that interlocutory orders entered by the state court to protect various rights of the parties will not lapse upon removal to federal court. It is clear that once a case has been removed to federal court, federal law rather than state law governs the course of proceedings.

Rule 65(b) of the Federal Rules of Civil Procedure addresses the subject of temporary restraining orders and provides in relevant part as follows:

A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney *only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result* to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required. (emphasis added)

This Court is cognizant of the federal aversion to granting ex parte temporary restraining orders. In this case, the Ex Parte Temporary Restraining Order was entered on April 29, 2003, without notice and an opportunity for the Corps of Engineers or other interested parties to be heard.

It is well-established under federal law that a temporary restraining order is an emergency remedy which should only be issued in exceptional circumstances. The United States Supreme Court has recognized that a temporary restraining order is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997); *West v. Derby Unified School Dist. No. 260*, 23 F.Supp.2d 1220, 1221 (D.Kan.1998). It is only on rare occasions that an ex parte temporary restraining order is proper and then such orders "should be limited to preserving the status quo only for so long as is necessary to hold a hearing." *First Technology Safety Systems, Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir.1993) (citing *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 439, 94 S.Ct. 1113,

39 L.Ed.2d 435 (1974)). Under Rule 65(b) of the Federal Rules of Civil Procedure, a temporary restraining order may only be granted if it clearly appears from specific facts shown in affidavit(s) or by a verified complaint that "immediate and irreparable injury, loss, or damage will result."

■ The Court recognizes that ex parte temporary restraining orders are necessary in certain circumstances. However, under federal law such orders should be restricted to serving their underlying purpose of preserving the status quo and preventing "immediate and irreparable injury, loss, or damage" so long as is necessary to hold a hearing. On a motion to dissolve a temporary restraining order, the party that obtained the order (State of North Dakota) bears the burden of justifying the need for continued injunctive relief on a temporary basis and bears the burden of demonstrating "immediate and irreparable injury, loss, or damage." It is clear that if the federal standard for granting a motion for a temporary restraining order is not met, the TRO should not be continued. Nevertheless, the parties are still entitled to a hearing on the application for a preliminary injunction where the burden of establishing *immediate* harm no longer exists—only a showing of *irreparable* harm.

The issue that must be determined in this proceeding as a preliminary matter is whether the State of North Dakota has demonstrated, by a clear showing, that it will suffer *"immediate and irreparable injury, loss, or damage"* between now and June 4, 2003, when the Court has scheduled a hearing on the Plaintiffs' Motion for Preliminary Injunction. For the reasons set forth below, the Court finds that the plaintiffs have not met that burden of establishing *"immediate"* injury, loss, or damage. As a result, the Ex Parte Temporary Restraining Order should be dissolved at this stage of the litigation.

In the materials presented to the Court, no persuasive showing has been made that the State of North Dakota will suffer *"immediate* and irreparable injury, loss, or damage" if the temporary restraining order is not continued at this stage. Both North Dakota and South Dakota acknowledged at the hearing on May 13, 2003, that the smelt spawn would be complete for 2003 by May 25th. According to the evidence presented to the Court, there is virtually no risk to the smelt eggs at this point in time. The State's initial concerns about maintaining the average elevation of Lake Sakakawea in May before it stratifies and protecting the smelt spawn have been addressed. *See* Order Modifying Ex Parte Temporary Restraining Order dated May 16, 2003.

Simply stated, there is no contention that the Corps of Engineers is currently in violation of North Dakota's anti-pollution laws or the State's water quality regulations. The threat of *immediate* injury, loss, or damage that warranted the issuance of a temporary restraining order on April 29, 2003, has now passed according to the evidence presented to the Court and the admissions of the parties. There is no evidence before the Court of any *immediate* injury, loss, or damage to the State. There certainly may be evidence presented of irreparable harm in the long-term, but nothing of an immediate nature, and certainly no irreparable harm that cannot be addressed at the upcoming hearing on a preliminary injunction. In summary, the Court has been presented with insufficient evidence at this stage to demonstrate that there is a threat of *"immediate* and irreparable injury, loss, or damage" for the few remaining days of May and early June 2003 until the time of the next hearing scheduled for Wednesday, June 4, 2003.

■ The second basis for the State's request for temporary injunctive relief

concerns the survival of the cold water fishery in Lake Sakakawea as it relates to the amount of inflow into the lake which exceeds outflow during June, July, and August 2003. The State has acknowledged that there are several means to address this concern. The State's proposal, which was incorporated into the TRO, provides for a systematic decrease in the amount of water that is released from Garrison Dam under the Corps' Annual Operating Plan for 2003. The State contends that to avoid irreparable harm to Lake Sakakawea there is a need to decrease the outflows from the lake as much as possible during June, July, and August. That may be an accurate statement but it does not warrant the issuance of a TRO because such concerns and any proposed remedies can be addressed at the preliminary injunction hearing on June 4, 2003.

The State has acknowledged that their proposed remedy, as incorporated in the TRO, is a conservative approach based in part on guesstimates and projected forecasts as to the lake levels throughout the summer months of 2003. The projected inflow and outflow to Lake Sakakawea as forecast by the Corps of Engineers, as well as by the experts retained by the State, are merely forecasts at this stage. The TRO itself acknowledges that the amount of releases can be adjusted throughout the summer after the Court receives further evidence and argument at the hearing on the preliminary injunction. As such, the immediacy of the harm has not been established. More important, the subject of whether irreparable harm will occur at some later date is one that can be, and will be, addressed at the preliminary injunction hearing on June 4, 2003.

The Court finds that the State of North Dakota has not met its burden of establishing by a clear showing that the Ex Parte Temporary Restraining Order issued on April 29, 2003, needs to be continued at this stage of the litigation. The specific issue before the Court at present is whether there has been a sufficient showing that there is an "immediate and irreparable injury, loss, or damage" that will result to the State if the temporary restraining order is not continued. The Court concludes that the State has not made such a showing.

Assuming the hearing on the Plaintiffs' Motion for Preliminary Injunction goes ahead, the parties need not repeat the extensive evidence that has already been presented in written form or the evidence presented at the hearing conducted on May 12, 2003. The parties are to address the *Dataphase* criteria that this Court must consider in determining whether a preliminary injunction should be issued.

This Court is very cognizant of the importance that Lake Sakakawea has to the State of North Dakota, and particularly the importance to the fishing, recreational, and tourism industry. Garrison Dam, Lake Sakakawea, and the Missouri River are of vital importance to the State of North Dakota. Unfortunately, Mother Nature has not been kind and we are now experiencing the fourth year of a significant drought in the Missouri River Basin. The sharply divergent interests of the many states that are effected by the Corps of Engineers' plans for operation of the Missouri River Main Stem System have again resulted in a multitude of lawsuits filed in federal courts throughout this region. North Dakota has anti-pollution laws and water quality regulations that are similar to the federal Clean Water Act. North Dakota's regulatory schemes are also similar to the anti-pollution laws and regulations of each of the states that border the Missouri River. When the Corps of Engineers allegedly causes "pollution" in the State of North Dakota as that term is broadly defined under North Dakota

law, and water levels are held back to protect the cold water fishery and the biological integrity of Lake Sakakawea, then other downstream states suffer "pollution" as defined by their respective laws and regulations. There simply is no end to the vicious cycle nor any easy solution when drought conditions exist. The result of the drought on the water flows has, once again, pitted the upper basin states against the downstream states.

The State of North Dakota contends that the Corps of Engineers has continually favored a dwindling downstream navigation industry over the growing upstream recreational industry. Specifically, North Dakota officials contend that the economic benefits of downstream navigation have a value of $1 million as compared to a $65 million fishing and tourism industry upstream in North Dakota. Unfortunately, the dispute is not that simplistic, nor is it so easy to balance the equities. It is not a matter of simply weighing the projected value attributable to the barge industry downstream versus the projected value of fishing and tourism upstream.

For example, counsel for the State of Nebraska stated at the oral argument on May 13, 2003, that there are countless numbers of industries in Nebraska dependent upon the Missouri River which results in a $424 million annual economic benefit to Nebraska. In their pleadings on file in this dispute, Nebraska contends it will be seriously impacted by reduced water flows this summer because (1) Nebraska has power plants that rely on the Missouri River to operate within federal standards and unless water is available at certain minimum levels, four power plants may not be able to operate; (2) there will be significant harm to the water supplies of municipalities, and a resulting increase in treatment costs with reduced flows; (3) Nebraska has a vibrant fishing and recreational industry which will be impacted by reduced flows this summer; (4) there will be reduced economic activity associated with low flow conditions that may result in lost tax revenues in excess of millions of dollars; (5) Nebraska has its own regulatory schemes for water quality and anti-pollution laws and regulations and with diminished water flows, there will be an increase in water temperature which will alter the chemical and biological characteristics of the water with resulting violations of Nebraska's laws and regulatory schemes; (6) the City of Omaha relies on the Missouri River for water and recreation, as do other large cities such as Sioux City, Iowa; Council Bluffs, Iowa; St. Joseph, Missouri; and Kansas City Missouri; and (7) there are 71 recreational areas located between Sioux City, Iowa, and the mouth of the Missouri River that will be significantly impacted by reduced flows this summer. This is the presentation of evidence submitted by the State of Nebraska; only one of the Missouri River Basin states effected by the water flows of the Missouri River. Each of the states will undoubtedly suffer similar impacts in these drought conditions.

Virtually every state along the Missouri River has significant concerns and divergent interests in maintaining adequate water levels and water flows during the summer months of 2003. How are the federal courts to resolve this crisis and what is the role of the federal judiciary in the overall management and operation of the Missouri River? The Eighth Circuit Court of Appeals is presently considering a multitude of legal issues arising out of similar litigation that plagued the federal court system in May 2002. The flurry of lawsuits that inundate the federal courts each spring are becoming a spring ritual. There is no easy solution to this crisis. Every spring involves a race to the courthouse. What has become increasingly clear is that the federal courts are not the appropriate forum to

manage the Missouri River dams and reservoir systems.

This Court would again urge the parties to engage Government officials, political representatives at the state and national levels, attorney generals from each of the Missouri River Basin states, and other concerned entities, to become quickly involved in this crisis and seek to attempt to work on an acceptable resolution designed to address the divergent and important needs of all of the states effected. The endless stream of lawsuits will continue until the political forces and the Corps of Engineers attempt to seek a resolution in a forum other than the federal courts.

## IV. *CONCLUSION*

The defendant Corps of Engineers' Motion to Dissolve the Ex Parte Temporary Restraining Order is **GRANTED.** The TRO entered on April 29, 2003, and modified on May 16, 2003, is dissolved at this stage of the litigation. A hearing on the Plaintiffs' Motions for Preliminary Injunction is scheduled for Wednesday, June 4, 2003, beginning at 9:30 a.m. In the interim, the parties are urged the meet and confer about non-judicial remedies to resolve this never-ending crisis. The parties also have the opportunity to immediately appeal this order to the Eighth Circuit Court of Appeals pursuant to 28 U.S.C. § 1292(a)(1).

The Court is cognizant of the need to oversee the releases from Garrison Dam during June–August 2003, and is giving consideration to (1) the scheduling of an early settlement/mediation conference in early June 2003 before a Magistrate Judge to encourage discussion and explore settlement alternatives; and (2) the appointment of a Special Master pursuant to Rule 53 of the Federal Rules of Civil Procedure to monitor the releases and/or to become more intimately involved in the day-to-day operations and management of the Mis-souri River Main Stem Dam System during the summer of 2003.

**SO ORDERED.**